1
2
3
4
5
6

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

7
8
9  ALLEN KOERSCHNER,

10        *Petitioner*,                              3:05-cv-00587-LRH-VPC

11  vs.

12  MICHAEL BUDGE, *et al.*,                         ORDER

13        *Respondents*.

14

15        This habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the

16  remaining grounds.

17                              *Background*

18        Petitioner Allen Koerschner seeks to set aside his Nevada state conviction, pursuant to a jury

19  verdict, of two counts of sexual assault of a minor.  He is sentenced to two consecutive life sentences

20  with the possibility of parole after ten years on each sentence.  He challenged the conviction on direct

21  appeal and a number of collateral review or other proceedings in the state courts.  Grounds 1, 2, 6, 7 and

22  8 remain for decision.

23                            *Standard of Review*

24        The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential"

25  standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court

26  decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).  Under

27  this highly deferential standard of review, a federal court may not grant habeas relief merely because

28  it might conclude that a decision was incorrect.  131 S.Ct. at 1411.  Instead, under 28 U.S.C. § 2254(d),

the court may grant relief only if the decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 131 S.Ct. at 1398-1401.

A state court decision on the merits is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003). A decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell*, 540 U.S. at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id*. The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference to the state court's determination:

> . . . . [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate

1  panel, applying the normal standards of appellate review, could not
2  reasonably conclude that the finding is supported by the record.

3  *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

4  Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless

5  rebutted by clear and convincing evidence.

6  The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled

7  to habeas relief. *Pinholster*, 131 S.Ct. at 1398.

8  ***Discussion***

9  ***Ground 1: Initial Proceedings***

10  In Ground 1, petitioner alleges that he was denied rights to due process, equal protection and

11  to be free from unreasonable seizure under the Fourth and Fourteenth Amendments when he was not

12  present for a probable cause determination, when he was denied a speedy arraignment, and when the

13  criminal complaint was not properly filed.[1]

14  The state court record reflects the following.

15  Petitioner was arrested on Thursday, May 28, 1992.  The justice court minutes reflect that a

16  probable cause determination was made the following day, Friday, May 29, 1992. Petitioner asserts that

17  he was not present for the probable cause determination.  The minutes do not state anything regarding

18  presence or absence on that date, but the minutes do refer to a "first appearance before a magistrate"

19  on Tuesday, June 2, 1992.  While petitioner asserts that he was not present when the probable cause

20  determination was made, he does not dispute that the probable cause determination was made on May

21  29, 1992, as the minutes reflect.[2]

22  The minutes appear to reflect that petitioner first appeared before a magistrate on the above-

23  referenced Tuesday, June 2, 1992, the third judicial day after his arrest. Petitioner asserts, however, that

24  he was not brought to court until June 4, 1992, which would be the fifth judicial day after his arrest.

25

26  [1]The first counseled amended petition together with the answer and reply as to Grounds 1, 2 and 8(b) may be
found in the record at ## 63, 86 & 87 respectively.

27

28  [2]#64, Ex. 1, at 1 (electronic docketing page 2).  The following references in the text to the minutes with respect
to in or around June 1992 also are based on the same exhibit, either the cited page or a page following shortly thereafter.

1    The minutes show a line entry with that date stating: "Defendant REMANDED Metro/$75,000." The

2    minutes suggest a continuance of proceedings to June 11, 1992, but with no proceedings thereafter on

3    that date.

4         Subsequently, on June 12, 1992, an attorney filed a motion to place the matter on calendar and

5    entered a limited appearance only for the purpose of challenging detention.  The motion stated that

6    Koerschner had not been advised of the charges, arraigned or assigned counsel.

7         The minutes contain an entry for June 12, 1992 reading: "COMPLAINT SWORN TO &

8    FILED."  The copy of the justice court complaint in the federal record does not have an at least

9    discernible file-stamp.[3]

10        The minutes further reflect that on June 16, 1992, petitioner appeared with the above-referenced

11   counsel for initial arraignment.  The minutes state, *inter alia*: "Complaint presented, advised, and

12   waives."

13        The court appointed the public defender on June 18, 1992, and a preliminary hearing was set

14   for June 30, 1992, which petitioner thereafter waived apparently in connection with plea negotiations.

15        Petitioner subsequently was charged by information on the bindover to the state district court.

16   He entered a guilty plea a short time thereafter that later was set aside by the state supreme court due

17   to an inadequate plea canvass.  He thereafter was prosecuted upon an information on remand, and he

18   was convicted under the present judgment of conviction following a jury trial.

19        Under the Court's prior rulings herein, Ground 1 was exhausted on an extraordinary original

20   petition that the state supreme court denied without expressly stating that it did not reach the merits.[4]

21        The state supreme court's summary rejection of the claim on the merits is entitled to no less

22   deference on AEDPA review than a fully articulated decision.  In *Harrington v. Richter*, 562 U.S. 86

23   (2011), the Supreme Court rejected the proposition that a summary rejection of a claim is entitled to less

24

25        [3]#64, Ex. 3.

26

27        [4]The Court applied the decision issued during the pendency of this action in *Chambers v. McDaniel*, 549 F.3d
     1191, 1195-99 (9th Cir. 2008).  See #113, at 4, lines 18-20 ("Given that the claims in federal Grounds 1, 6, 7 and 8(A)

28   were presented by petitioner in the original petition, they are exhausted pursuant to the holding in *Chambers*."); #120
     (denying respondents' motion for reconsideration).

1  deference on AEDPA review.  The Court held that "[w]here a state court's decision is unaccompanied

2  by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

3  basis for the state court to deny relief." 131 S.Ct. at 784.  The Court made it clear that satisfying this

4  burden is just as difficult in a case with a summary denial as it is in a case with a fully-articulated

5  decision:

6

7          If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a

8  complete bar on federal court relitigation of claims already rejected in state proceedings.  *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S.Ct.

9  2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata rule" under § 2244).  It preserves authority to issue the writ in

10  cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes

11  no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice

12  systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d

13  560 (1979) (Stevens, J., concurring in judgment).  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show

14  that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood

15  and comprehended in existing law beyond any possibility for fairminded disagreement.

16  562 U.S. at 786-87.

17          Petitioner has not established on federal habeas review that the state supreme court's rejection

18  of the claims in Ground 1 was either contrary to or an objectively unreasonable application of clearly

19  established federal law as determined by the United States Supreme Court.

20          At the very outset, to the extent that petitioner bases Ground 1 on the Fourth Amendment,

21  Ground 1 is not cognizable on federal habeas review under *Stone v. Powell*, 428 U.S. 465 (1976).

22  Petitioner presents no argument that he did not have an opportunity for full and fair litigation of the

23  Fourth Amendment claim in the state courts; and, pursuant to the *Chambers* holding at least, the claim

24  was addressed on the merits by the Supreme Court of Nevada.  To the extent that petitioner's counsel

25  in sundry state court proceedings did not also pursue the claim, that does not make the claim cognizable

26  under *Stone v. Powell* but instead is a matter addressed, if at all, on an ineffective-assistance claim.

27          In all events, petitioner does not cite to the Court any – apposite – United States Supreme Court

28  precedent establishing that a criminal defendant convicted subsequently on an information *can vacate*

*his conviction* – whether under the Fourth Amendment, the Equal Protection Clause,[5] and/or the Due Process Clause – based upon some *arguendo* prior alleged irregularity in his initial detention, arraignment and/or the filing of a prior complaint. The Supreme Court instead has emphatically rejected the proposition that such alleged irregularities provide a basis for *overturning a conviction* as opposed to securing an immediate release from an unlawful initial physical custody:

> In holding that the prosecutor's assessment of probable cause is not sufficient alone to justify restraint of liberty pending trial, we do not imply that the accused is entitled to judicial oversight or review of the decision to prosecute. Instead, we adhere to the Court's prior holding that a judicial hearing is not prerequisite to prosecution by information. *Beck v. Washington*, 369 U.S. 541, 545, 82 S.Ct. 955, 957, 8 L.Ed.2d 98 (1962); *Lem Woon v. Oregon*, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed. 1340 (1913). Nor do we retreat from the established rule that illegal arrest or detention does not void a subsequent conviction. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). Thus, as the Court of Appeals noted below, although a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause. 483 F.2d, at 786-787. *Compare Scarbrough v. Dutton*, 393 F.2d 6 (CA5 1968), *with Brown v. Fauntleroy*, 143 U.S.App.D.C. 116, 442 F.2d 838 (1971), *and Cooley v. Stone*, 134 U.S.App.D.C. 317, 414 F.2d 1213 (1969).

*Gerstein v. Pugh*, 420 U.S. 103, 118-119 (1975). *Cf. United States v. Mechanik*, 475 U.S. 66 (1986)(in federal criminal proceeding, error in grand jury proceeding was rendered harmless by subsequent conviction by petit jury at trial).

Petitioner, who has the burden of persuasion on federal habeas review, has not presented any apposite Supreme Court authority establishing to the contrary. The Court notes that the federal reply only cites to petitioner's *pro se* filings in the state courts, tacitly reflecting the absence of any apposite Supreme Court authority that could be presented in support of this ground on federal habeas review.

Ground 1 therefore does not provide a basis for federal habeas relief.[6]

---

[5]The Court notes that the Equal Protection Clause does not mandate that every similarly situated individual be treated with absolutely equal treatment in all situations by government officials. That is, not every dissimilar treatment of allegedly similarly situated individuals *ipso facto* violates the Equal Protection Clause even where more directly applicable constitutional provisions do not provide a basis for relief. Petitioner cites no *apposite* Supreme Court authority establishing right to relief under the Equal Protection Clause in this context.

[6]It does not appear that the State secured statements or other evidence from petitioner during the allegedly illegal detention, such that petitioner is challenging only the initial detention and proceedings thereon. Petitioner's argument that the alleged deficiencies deprived the state court of jurisdiction and thus rendered null all subsequent

(continued...)

-6-

### *Ground 2: Victim's Statements to Medical Providers*

In Ground 2 as alleged in the first counseled amended petition, petitioner alleges that he was denied rights "to due process" under the Fifth, Sixth and Fourteenth Amendments by the admission of statements that the child victim of the sexual assaults made to Nurse Gema Reynolds, R.N., and to Dr. Donald Roberts, M.D.

The claim presented in the appellant's opening brief on direct appeal quite arguably presented exclusively a claim of alleged state law error in applying the hearsay exception in N.R.S. 51.115 for statements made for medical diagnosis or treatment.[7]  Koerschner cited federal case authority, but an argument perhaps might have been made – at least as of that juncture – that the federal cases were cited with regard to application of the hearsay evidentiary rule rather than for constitutional doctrine.[8]  Be that as it perhaps may have been, the State nonetheless included argument on, *inter alia*, a federal constitutional issue in its answering brief;[9] and Koerschner responded with Confrontation Clause argument in his reply brief.[10]  The Supreme Court of Nevada made no express statement in its order of affirmance, discussed further below, that Koerschner impermissibly was pursuing a constitutional issue for the first time in his reply brief.

As noted above, petitioner alleged on federal habeas review in the first counseled amended petition that he was denied rights "to due process" by the admission of the evidence.  Habeas pleading

---

[6](...continued)

proceedings under Nevada state law was implicitly rejected by the Supreme Court of Nevada when it denied the claim. The Supreme Court of Nevada is the final arbiter of state law in that regard.  Petitioner cites no apposite United States Supreme Court precedent establishing that the particular deficiencies alleged in this case in some strained sense deprived the state courts of jurisdiction to convict as a matter of federal constitutional law.  The argument that these or similar alleged deficiencies deprived the state courts of jurisdiction to convict is made frequently to this Court by proper person inmates.  It is a frivolous argument.  The Court makes no implicit determination that petitioner's factual allegations that contradict the available state court record are true.  He simply is not entitled to have his conviction for two counts of sexual assault of a minor overturned even if his factual allegations regarding the initial proceedings in 1992 are assumed to be true.

[7]#69, Ex. 77, at 11-20.

[8]*Id.*, at 15, lines 17-21; at 17, lines 8-18.

[9]#70, Ex. 79, at 9-10.

[10]#70, Ex. 80, at 1-2.

1  of course is not notice pleading.  *Mayle v. Felix*, 545 U.S. 644, 655-56 (2005).  An argument thus

2  perhaps could have been made – at least as of that juncture – that petitioner had not presented a

3  Confrontation Clause claim in the counseled amended petition.  Be that as it perhaps may have been,

4  respondents nonetheless argued, *inter alia*, a Sixth Amendment Confrontation Clause issue in the

5  answer;[11] and petitioner presented responding Confrontation Clause argument in his reply.[12]

6        On the showing and arguments made, the Court proceeds on the basis that petitioner's

7  constitutional claims in Ground 2 include a Confrontation Clause claim, that federal constitutional

8  claims including a Confrontation Clause claim were exhausted on direct appeal, that the Supreme Court

9  of Nevada implicitly rejected the exhausted constitutional claims, and that this Court accordingly should

10  review that implicit rejection of the constitutional claims under AEDPA's deferential standard of

11  review.  *Cf. Richter, supra.*[13]

12        However, in the order quoted *infra*, the state supreme court addressed only a claim that the

13  victim's statements to Nurse Reynolds were admitted improperly.  The court did not address any claim

14  that statements made to Dr. Roberts were admitted improperly.  Nor does it appear that petitioner raised

15  a claim on direct appeal challenging the admission of the statements made to Dr. Roberts.  Petitioner's

16  appellate briefing explicitly challenged only the statements made to Nurse Reynolds.  Petitioner referred

17  in the briefing to Dr. Roberts' involvement to make the point that the statements made to Nurse

---

19  [11]#86, at 24.

20  [12]#87, at 7-11.  Respondents later argued that no Confrontation Clause claim was presented in Ground 2 in the

21  counseled federal amended petition. #117, at 7.  The Court is not tarrying further herein over late-breaking arguments.

22  [13]Petitioner maintains that *Delgado v. Lewis*, 223 F.3d 976 (9th Cir. 2000), and *Lewis v. Mayle*, 391 F.3d 989

(9th Cir. 2004), require that the claim be reviewed *de novo* because the state supreme court did not expressly address the

23  Confrontation Clause claim.  *Delgado* instead holds that federal habeas review in that situation is *not de novo* and that

the court must conduct an independent review of the record to determine, *under the AEDPA standard*, whether the

24  rejection of the claim was an unreasonable application of clearly established federal law.  223 F.3d at 982.  In *Lewis*, the

Court of Appeals concluded that the state court had resolved an issue expressly in a manner where it did not reach and

25  decide the issue before the federal courts.  391 F.3d at 994-95 & 996.  The rejection of a factually parallel state law

claim, however, does not necessitate a conclusion that the state court has not reached the parallel federal claim upon

26  which the defendant also relies.  Rather, the inference from the state court's affirmance of the conviction in that context

is that it has rejected the parallel federal constitutional argument.  Neither *Delgado* nor *Lewis* held that review of a state

27  court's implicit rejection of a federal constitutional claim while rejecting a parallel state claim based on the same facts

leads to *de novo* review on federal habeas review.  In all events, the Supreme Court's *Richter* decision – issued after

28  petitioner's reply to Ground 2 – establishes that the AEDPA deferential standard of review governs.

Reynolds allegedly were made after the initial evaluation had been concluded.[14]   At this juncture, however, even if respondents have not waived an exhaustion defense as a matter of substantive law under 28 U.S.C. § 2254(b)(3), respondents nonetheless have had sufficient opportunity to present an exhaustion defense in this regard in the district court, on a 1997 conviction for a 1992 offense on a federal petition filed initially in 2005.  The Court thus addresses the claims concerning statements to Dr. Roberts on the merits on a *de novo* review.

Against that backdrop, the Court turns to review of Ground 2 on the merits, under deferential review as to claims concerning statements to Nurse Reynolds and on a *de novo* review as to claims concerning statements to Dr. Roberts.

In a December 4, 2000, published opinion on direct appeal, the Supreme Court of Nevada stated the background facts and rejected the claim presented to that Court on the following grounds:

*FACTS*

Allen Koerschner and his spouse took custody of their nine-year-old niece following the death of her mother. On May 2, 1992, the niece was admitted to a Las Vegas hospital with severe bleeding from the area of her cervix.  She initially advised hospital personnel that the bleeding was caused by a fall down a flight of stairs.

Gema Reynolds, a nurse trained in sexual assault cases, was the first person to examine the child.  No bruises, scratches, abrasions, or lacerations were identified.   Concluding that the injury was not consistent with a fall, Nurse Reynolds undertook further questioning.  The child then described a sexual assault, which she claimed was perpetrated by Koerschner.

Subsequent examination by Dr. Donald Roberts revealed the absence of a hymenal ring and a four centimeter laceration of the victim's vaginal wall.  Dr. Roberts noted that the lack of a hymenal ring and the necessity of using an adult-sized speculum to conduct the examination were unusual for a nine-year-old female.  He then concluded that the injury was not caused by a fall.

. . . . .

*Hearsay statements to medical personnel*

Koerschner next contends that the district court erred in admitting prior consistent statements made by the victim to Nurse

_____

[14]#69, Ex. 77, at page 11, lines 5-6; pages 12-13; and page 15, lines 13-14; #70, Ex. 80, at page 1, lines 2-3; pages 2-3; and pages 4-5.

Reynolds because the statements were hearsay.  The statements were made during the first evening of a three-day hospital stay.

NRS 51.115 provides:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain or sensations, or the inception or general character of the cause or external source thereof are not inadmissible under the hearsay rule insofar as they were reasonably pertinent to diagnosis or treatment.

We conclude that the statements made by the victim to Nurse Reynolds were made during the course of her medical treatment, in accordance with NRS 51.115.  While the statements were made after the initial treatment was completed, the statements were pertinent to ongoing care for the victim.[FN5]

> [FN5] The State argues that the prior consistent statements to Nurse Reynolds were admissible as non-hearsay under NRS 51.035(2)(b).  In light of our ruling that the statements were admissible under NRS 51.115, we need not reach this issue.  Additionally, it was not necessary for the district court to conduct a separate "trustworthiness" hearing under *Lytle v. State*, 107 Nev. 589, 590, 816 P.2d 1082, 1083 (1991), the statements of this victim having been admissible under a well recognized hearsay exception.

*Koerschner v. State*, 116 Nev. 1111, 1113-14 & 1118, 13 P.3d 451, 453 & 456 (2000).

As discussed previously as to Ground 1, the state supreme court's implicit rejection of petitioner's constitutional claims on the merits is entitled to no less deference on federal habeas review than a fully articulated rejection of the claims.  *Richter, supra*.  Moreover, the issue of whether the state supreme court's rejection of the claims was contrary to or an unreasonable application of clearly established federal law must be adjudicated based on the United States Supreme Court precedent that existed at the time of the state supreme court's December 4, 2000, decision.  *Greene v. Fisher*, 132 S.Ct. 38 (2011).

The state supreme court's rejection of petitioner's federal constitutional claims regarding statements made to Nurse Reynolds was neither contrary to nor an unreasonable application of clearly established federal law as determined by the holdings of the Supreme Court on December 4, 2000.

With regard to the Confrontation Clause claim, at the time of the state supreme court's December 4, 2000, decision, the Supreme Court's decision in *Ohio v. Roberts*, 448 U.S. 56 (1980),

remained good law.[15]  In *Roberts*, the Court held that the Confrontation Clause did not bar the admission of an unavailable witness' prior statement if the evidence bore adequate indicia of reliability. This reliability test was met if the evidence either fell within a firmly rooted hearsay exception or otherwise bore particularized guarantees of trustworthiness.  448 U.S. at 66.[16]

The Supreme Court thereafter held in *White v. Illinois*, 502 U.S. 346 (1992), *inter alia*, that statements made for medical diagnosis or treatment fell within a firmly rooted hearsay exception.  502 U.S. at 355 n.8 ("no doubt that . . . 'firmly rooted'").  The Court so held specifically in the context of an out-of-court statement by a four-year-old child victim regarding a sexual assault of the child to a nurse and physician examining the victim thereafter.  502 U.S. at 350-51.[17]

_____

[15]*Roberts* later was overruled in *Crawford v. Washington*, 541 U.S. 36 (2004), over three years after the state supreme court's decision on direct appeal.  *Crawford* in any event does not apply retroactively to a conviction, such as Koerschner's, that had become final on direct review prior to *Crawford*.  *Whorton v. Bockting*, 549 U.S. 406 (2007).

[16]Respondents contend in the federal answer that the fact that the victim testified at Koerschner's trial and was subject to cross-examination precluded any finding of a Confrontation Clause violation at the very outset.  *See, e.g., California v. Green*, 399 U.S. 149 (1970)("none of our decisions interpreting the Confrontation Clause requires excluding the out-of-court statements of a witness who is available and testifying at trial").  Petitioner contends in the reply that a Confrontation Clause issue was not eliminated because limitations allegedly were placed on the defense cross-examination of the victim, referring to other claims based upon these alleged limitations.  Petitioner relies upon the statement in *United States v. Owens*, 484 U.S. 554, 560 (1988), that a Confrontation Clause inquiry is not called for "when a hearsay declarant is present at trial and subject to unrestricted cross-examination."  The Court is not sanguine that the statement in *Owens* signifies that the admission of every out-of-court statement by a testifying hearsay declarant thereby becomes subject to a potential Confrontation Clause analysis whenever any restriction is placed upon defense cross-examination of the declarant at trial.  However, as noted, the Court need not tarry over the preliminary issue because a rejection of the claim in all events was neither contrary to nor an unreasonable application of Supreme Court Confrontation Clause precedent at the relevant time.

[17]Notably, in indirect relation to the discussion in the preceding footnote, the child victim in *White* did not testify.  The Supreme Court held that if the challenged statement in question was an out-of-court statement rather than prior testimony as in *Roberts*, the State was not required to satisfy a constitutional unavailability requirement as a prerequisite to admission of the evidence over a Confrontation Clause objection if the statement fell within the hearsay exception.  502 U.S. at 353-56.  Thus, in Koerschner's case, if the statements fell within the hearsay exception, the statements would have been admissible over a Confrontation Clause objection even if the child victim had not been present for any cross-examination whatsoever.

Petitioner points to *Idaho v. Wright*, 497 U.S. 805 (1990), in which the Supreme Court held, *inter alia*, that a pediatrician's testimony as to statements by a child victim lacked the requisite indicia of reliability to be admissible under the Confrontation Clause.  In *Wright*, however, the statements were admitted instead pursuant to a residual hearsay exception similar to Rule 807 of the Federal Rules of Evidence.  The Court held that such a residual exception for statements not specifically covered by a recognized hearsay exception "almost by definition" did not constitute a firmly rooted hearsay exception.  497 U.S. at 817-818.  The Confrontation Clause analysis therefore required that the Court

(continued...)

1    Accordingly, a state court holding that the admission of the child victim's statements to the

2    nurse in the present case under the hearsay exception for statements made for medical diagnosis or

3    treatment did not violate the Confrontation Clause would appear at least on its face to be neither

4    contrary to nor an objectively unreasonable application of clearly established federal law.

5    Petitioner urges, however, that the child's statements did not fall within the medical treatment

6    hearsay exception because: (a) the statements were not made during the initial examination and she was

7    not requesting immediate relief; and (b) Nurse Reynolds continued questioning subsequent to the initial

8    examination allegedly not for the purpose of treating the victim but instead to determine the truth of

9    what happened.  Petitioner suggests that the only statement that properly would have been admissible

10    under the medical treatment hearsay exception would have been the child victim's immediate statement

11    during the initial examination that she had "fallen down a flight of stairs."  He maintains that the state

12    supreme court's "creative interpretation" of the medical treatment exception was not "firmly rooted"

13    within the meaning of the Confrontation Clause.[18]

14    Petitioner cites no apposite precedent of the United States Supreme Court as of December 4,

15    2000 – or thereafter – requiring that the Supreme Court of Nevada construe the medical treatment

16

17    [17](...continued)

18    examine whether the statements otherwise bore particularized guarantees of trustworthiness in the particular case.  In *White*, in contrast, which was decided less than two years later, the child victim's statements fell within the firmly rooted

19    exception for statements made for medical diagnosis or treatment.  No issue in regard to whether the statements fell within the hearsay exception was presented on *certiorari* review.  502 U.S. at 351 n.4.  The *White* opinions cited the

20    *Wright* opinion at multiple points without even the remotest of suggestions by either the majority or the concurring justices that there was any inconsistency between the two cases.  *See* 502 U.S. at 352, 355 n.8, 357, 359, 363 & 366.

21    Accordingly, a state supreme court's rejection of a Confrontation Clause challenge to the admission of statements that it found fell within the medical treatment hearsay exception would be neither contrary to nor an unreasonable application

22    of *Wright* – which did not involve that exception – given the controlling precedent in *White* – which did.

23    Petitioner cites *Wright* for the proposition that "[a]n out-of-court statement is not permissible under the Confrontation Clause simply because it is ruled admissible under a state hearsay exception." #87, at 7.  However,

24    *Wright*, again, dealt with a *residual* hearsay exception.  Under *Roberts*, if a statement fell within a "firmly rooted hearsay exception" the admission of the statement did not contravene the Confrontation Clause; and *White* established that the

25    medical treatment exception constituted such a "firmly rooted hearsay exception" under *Roberts*.  A general statement that evidence is not admissible under the Confrontation Clause simply because it is admissible under a state hearsay

26    exception therefore begs the question in this case.  Under clearly established Supreme Court precedent at the time of the state supreme court's December 4, 2000, decision, the admission of a statement that was admissible *under the medical*

27    *treatment hearsay exception* did not violate the Confrontation Clause.  *White, supra*.

28    [18]#63, at 9-10; #87, at 9-10.

1    hearsay exception, for purposes of Confrontation Clause review, as applying to statements only seeking

2    "immediate relief" and only in an "initial examination."  There are a number of established hearsay

3    exceptions that inherently require such immediacy and spontaneity for a statement to be admissible,

4    such as the exceptions for present sense impressions, excited utterances, and a statement as to a then-

5    existing mental, emotional or physical condition.  *See, e.g.*, Fed. R. Evi. 803(1) through (3).  Well-

6    established statements of the medical treatment exception, in contrast, make no reference to

7    "immediate" requests for relief or to "initial" treatment.  Rather, such formulations refer to statements

8    as to "medical history," "past or present symptoms or sensations," the "inception" of symptoms, and

9    "their general cause."  *See, e.g.*, Fed. R. Evi. 803(4).  The central inquiry under a classic statement of

10   the exception is not directed to immediacy of the request or to whether treatment is "initial" but instead

11   is to whether the statement "is made for – and is reasonably pertinent to – medical diagnosis or

12   treatment."  *Id.*  Medical diagnosis and treatment – including in particular the process of differential

13   diagnosis – quite obviously often is a continuing process going well beyond merely responding to an

14   "immediate" request for relief in a single initial examination.  The medical treatment hearsay exception

15   just as obviously is not limited only to immediate requests for relief given only at an initial evaluation.[19]

16           On petitioner's second point, the Supreme Court of Nevada found directly to the contrary with

17   regard to the child victim's statements to Nurse Reynolds.  The state supreme court found following

18   review of the record that the statements made to Nurse Reynolds were pertinent to the ongoing care for

19   the victim.  The state supreme court's factual findings as an appellate court are subject to deferential

20   review under AEDPA.  *See, e.g., Deere v. Cullen*, 718 F.3d 1124, 1144 (9th Cir. 2013), *petition for*

21

22           [19]Petitioner relies upon *United States v. George*, 960 F.2d 97 (9th Cir. 1992), maintaining that the medical
     treatment hearsay exception applies only in circumstances such as were presented in that case, where the child victim
23   made the statements in question during the initial examination.  The Ninth Circuit made no holding in *George* that the
     same statements made at a later evaluation would have been *not* admissible.  Indeed, the discussion in *George* affirming
24   the district court's rejection of the Confrontation Clause objection to the victim's statement identifying the defendant as
     the perpetrator reinforces the point that the holding of the Supreme Court of Nevada in this case was neither contrary to
25   nor an unreasonable application of clearly established federal law.  *See* 960 F.2d at 99-100.  That is, the discussion in
     *George* undercuts petitioner's arguments herein on multiple points.  In any event, however, petitioner must establish that
26   the state supreme court's rejection of his claim was an objectively unreasonable application of clearly established federal
     law as determined by the United States Supreme Court.  He cites no apposite Supreme Court authority as of December
27   4, 2000, requiring the Supreme Court of Nevada to construe the medical treatment hearsay exception as applying only to
     immediate requests for relief in connection with an initial evaluation for purposes of applying the Confrontation Clause.
28

-13-

*certiorari filed* (May 12, 2014); *see also Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002)(deferential review of factual findings even where review is *de novo* as to the law).  In order to demonstrate that this finding constituted an unreasonable determination of fact, petitioner must show "that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor, supra.*

The trial record instead contains an abundance of evidence supporting the state supreme court's factual determination that the statements made to Nurse Reynolds were pertinent to the ongoing care of the victim.  The record also supports a similar finding on *de novo* review as to statements made to Dr. Roberts, which the Court reviews contemporaneously below also with respect to that claim.

Family members presented with the victim, C.B., at the emergency room intake desk at approximately 6:30 p.m.  C.B. presented with vaginal bleeding.  A family member or members told intake personnel that C.B. had fallen down some stairs.[20]

Nurse Gema Reynolds, R.N., was an emergency room nurse, and she thus was not at intake.  Although she had training with regard to potential sexual abuse victims, she was not a sexual assault nurse examiner as such working only on sexual assault cases.  Rather, she testified that she was "strictly emergency room," being "subject to any kind of cases," not solely sexual assault cases.[21]

---

[20]#68, Ex. 68, at 104-06 & 113-14.

[21]#68, Ex. 68, at 102-03.  The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court.  The Court summarizes same solely as background to the issues presented, and it does not summarize all such material.  No statement of fact made in describing statements, testimony or other evidence constitutes a finding by this Court.  This order simply is not repeatedly prefacing every statement in the summary with an expression to the effect of "the witness testified that . . . ."  Moreover, any absence of mention of specific evidence in this recital does not signify that the Court has overlooked the evidence in considering petitioner's claims.

The Court additionally notes that other evidence corroborating a hearsay statement cannot be relied upon to establish the reliability of a hearsay statement that does not fall within a firmly rooted hearsay exception.  *Wright*, 497 U.S. at 820-24.  That principle has nothing to do with the current discussion.  First, that principle applies when a court is seeking to determine whether a statement that does not fall within a firmly rooted hearsay exception otherwise is reliable.  Such an inquiry never is reached if an antecedent determination is made that the statement instead does fall within a firmly rooted hearsay exception.  Second, in that vein, the current discussion is not seeking to assess whether C.B.'s statements were reliable but instead to assess whether the state supreme court's finding that the statements made to Nurse Reynolds were pertinent to ongoing care of the victim withstands review under the AEDPA standard.  *Wright* in no sense precludes a federal court from conducting the factual review set forth in the text.

-14-

1       On the evening in question, Nurse Reynolds testified that she had been working a twelve-hour

2   shift from 7:00 a.m. to 7:00 p.m., or perhaps 7:30 p.m. at the latest.  She was assigned to the cases seen

3   in a particular trauma examining room that evening.[22]

4       The triage nurse carried C.B. back to Nurse Reynolds' examining room, without using a gurney.

5   Nurse Reynolds testified that C.B.'s initial appearance was as follows:

> Physical appearance, she was – she was what we call ashen; she was sedate; her vital signs were – they were within in normal limits, but borderline; she was very listless; she was the color – ashen would be like a gray color; rapid respirations.

9   #68, Ex. 68, at 105.  The nurse testified that she was "definitely" concerned about C.B.'s condition at

10   that time.

11       Nurse Reynolds' observed C.B.'s physical condition as follows:

> She was bleeding – there was vaginal bleeding.  There were no external injuries or obvious external injuries.  She had no bruising, no scratches, no abrasions, no lacerations.

14   #68, Ex. 68, at 106.

15      The nurse testified that "[g]iven the initial history [of allegedly falling down the stairs], those

16   would be the injuries that we would be looking for, bruising, possible broken – a fracture, dislocated

17   hip, those kinds of injuries."  The injury from such an incident was referred to as a "straddle injury,"

18   and the injuries that emergency room medical providers would see from such a trauma would be

19   "[b]ruising, lacerations in the groin area . . . [and] lower extremities."[23]

20       Nurse Reynolds remained with C.B. thereafter during an examination by an emergency room

21   physician and then an OB/GYN physician who he called in to treat C.B.  She was with C.B. through

22   to the end of her shift a short time later at 7:00 p.m. or possibly 7:30 p.m.  She testified initially:

> Q.    How was your interaction with [C.B.]?

---

[22]Nurse Reynolds testified at two points that she worked until 7:00 p.m. and then at another point toward the end of cross-examination that she worked to 7:30 p.m. #68, Ex. 68, at 103-04, 118 & 128.  The former perhaps might be the more likely for a twelve-hour shift.  Either way, however, C.B. presented at the emergency room only a relatively short time before the end of Nurse Reynolds' shift.

[23]#68, Ex. 68, at 106-09.

-15-

1                A.      I was the nurse that admitted her into Room One, and I was the
2                              one that was responsible for her until my shift ended and she was
                             turned over –

3                Q.      How did she respond to you?

4                A.      I was her initial caretaker.  She basically held onto my hand and
5                              wouldn't let go, if that's what you mean.

6 #68, Ex. 68, at 113-14; see also *id.*, at 117 ("I was with [C.B.] through the whole procedure, through

7 everything.  I was assigned to her."); but cf. *id.*, at 122 (possible gap discussed *infra*).

8       The nurse asked emergency physician Dr. Ronald Scheer, M.D., to examine C.B.  Dr. Scheer

9 observed that C.B. was bleeding from the vaginal area, describing the bleeding as "rather brisk."  Her

10 vital signs "were a little bit unstable" with her heart rate having increased, "which showed some signs

11 of shock, secondary to the amount of bleeding that she had."[24]

12       Dr. Scheer put C.B. on an IV and sought to stabilize her, while also taking a history.  C.B. told

13 him that she fell down the steps and struck herself on the edge of a step.  This history was not consistent

14 with what he observed during the physical examination.  There was no bruising or other injury to the

15 external genitalia, and C.B. was bleeding from within the vagina.  When he tried to examine the interior

16 of C.B.'s vagina "the blood was coming out enough to where I couldn't tell exactly what the extent of

17 the injury was."[25]

18       When asked at trial why he did not question C.B further if he did not believe her history, the

19 emergency room physician responded:  "At that point, my primary objective was to take care of her

20 because she had ongoing bleeding that was beginning to become unstable."  The injury was "something

21 that could potentially be life threatening if left untreated."  Dr. Scheer testified that "[i]t could have been

22 left untreated to the point where she went into shock and died."[26]

23

24        [24]#68, Ex. 68, at 13, 14 & 16.

25        [25]#68, Ex. 68, at 14-16 & 28.

26        [26]#68, Ex. 68, at 17-18; see also *id.*, at 25 ("At that point, she was unstable.  My primary goal then was to start
27 some IV lines and resuscitate her."), 26 (similar); 27-28 (similar), and 31 ("Just making sure that we stopped the
bleeding so we could stabilize her vital signs."); see also *id.*, at 30-31 (cross-examination attempting to minimize the
28                                                            (continued...)

-16-

1    Dr. Scheer called in gynecologist Dr. Donald Roberts, M.D., to treat the brisk vaginal bleeding

2    that he observed.[27]

3    Emergency room personnel reported to Dr. Roberts the history initially given of the patient

4    having fallen down some stairs.  This history report was not conveyed to him by C.B. or anyone other

5    than emergency room personnel, who did not attribute the report specifically to C.B.[28]

6    At the time that Dr. Roberts first observed C.B., her vital signs had stabilized as of that point:

7    Her vital signs are what we would term as stable; her pulse was
     slightly high, but her blood pressure was normal, as was her temperature
8    and respirations.  Her skin was slightly pale.

9    #68, Ex. 68, at 45.  He acknowledged at trial that her condition at that point was to be contrasted with

10   her presentation on intake and that the role of emergency room staff was to first stabilize the patient.[29]

11   C.B. "was basically lying in a pool of blood on the gurney."[30]

12    Dr. Roberts introduced to himself to C.B.; he told her that he needed to examine her vagina and

13   what that specifically would involve him doing; and  he told her the position that he needed for her to

14   be in for the exam.  Dr. Roberts, then a resident, "had never seen a nine year old submit to an exam

15   without crying, without wanting someone there, without fighting the exam, until C.B.'s exam."  C.B.

16   instead "put her legs back as if she was putting them in stirrups and said, 'Go ahead.  Do what you have

17   to do.'"[31]

18   Dr. Roberts did not observe any external injury, as a source of the bleeding or otherwise.  This

19   finding by the physician was not consistent with either a straddle injury or an impaling injury from

20

21   [26](...continued)

22   doctor's assertion that the situation potentially was life-threatening).

23   [27]#68, Ex. 68, at 17, 19, 20-23 & 31-32 (Dr. Scheer); *id.*, at 143 (Dr. Roberts).

24   [28]#68, Ex. 68, at 147, 170 & 174.

25   [29]#68, Ex. 68, at 178.

26   [30]#68, Ex. 68, at 145.

27   [31]#68, Ex. 68, at 145-46 & 181.  At the time of the 1992 exam, Dr. Roberts had seen at least 25 cases involving
28   straddle or penetrating injuries of children requiring internal repair of the vaginal area.  By the time of the 1997 trial, he
     had seen more than 250.  He testified that his added experience had not changed his opinion in the case. *Id.*, at 140-42.

-17-

accidentally falling onto a foreign object.  The force of the external impact involved with both of those types of injuries typically produced external bruising and lacerations in addition to any internal injury.[32] When he began the internal examination, Dr. Roberts first used a speculum[33] sized for the examination of a child.  The child speculum was too small and did not allow him to see what he needed to see.  He instead had to use a full-sized adult speculum.[34]

Dr. Roberts then observed as follows:

> . . . .  There was no external bruising, no lacerations on the outside, a very large vaginal opening, adult woman size, and probably one to two centimeters from the opening of the vagina, two inches in length; and after I retrieved probably one cup of clotted blood from the vagina, the laceration began bleeding again profusely.

#68, Ex. 68, at 149.  There was no hymen.  That is, there were only very small, well-healed, remnants as with an adult hymen.[35]

Dr. Roberts  elaborated as follows on the nature and location of the internal force applied and the resulting injury:

> Q.      Where did you say that the tear was in [C.B.'s] vagina?

_____

[32]#68, Ex. 68, at 139-41, 147, 149-50, 157-58, 163-64 & 167.  Defense counsel explored on cross-examination the prospect that the internal injury – discussed further *infra* – could result from penetration by a foreign object other than a penis.  See *id.*, at 161-65 & 177; see also *id.*, at 189.  As noted previously, the issue before the Court does not concern the degree to which C.B.'s statements indicating sexual abuse were or were not corroborated by the medical evidence.  The salient point for the current inquiry is that the objective findings from physical examination were inconsistent with the history given on initial intake.  The objective findings were not consistent with a straddle injury from falling down stairs and striking the genitalia on a stair.  The objective findings also were not consistent with an impaling injury resulting from an accidental fall onto a foreign object, given the highly unlikely prospect of such a mechanism of internal injury not also involving associated external injury.  The question at hand is whether the victim's statements were made for and reasonably pertinent to medical diagnosis and treatment, which includes statements made, *inter alia*, describing medical history, the inception of symptoms, or their general cause.  *Cf.* Fed. R. Evi. 803(4).  Prior to the statements discussed *infra*, medical personnel were presented with an initial history report that conflicted then with their objective findings – which then would tend to prompt further inquiry as to medical history and causation in connection with continuing medical treatment.  The Court notes further, however, regarding the evidence as a general matter, that the particulars of the internal injury described *infra* were hardly consistent with the extent of injury from a voluntary, non-accidental insertion by the victim of a foreign object into her vagina separate instead from a fall, as intimated by the defense.

[33]An instrument for enlarging the opening of a cavity in order to facilitate inspection of its interior.  *Stedman's Medical Dictionary*, at 812 (3rd ed. 1997).

[34]#68, Ex. 68, at 147-48.

[35]#68, Ex. 68, at 152, 174 & 224 (including testimony on recall).

-18-

A.   It was past the opening, on the inside of the vagina and extended to the very end and down, posteriorly, or down toward the bottom, in kind of a chevron shape or an angle.

Q.   From the point of where the hymen would be internally, how far up above that would this tear have been?

A.   It was inside the vagina approximately one inch.  It did not start at the outside or close to the hymen.  It started inside the vagina and extended toward the end of the vagina.

Q.   How long would a vagina be in a nine year old?

A.   Probably an inch and a half to two inches in length.

Q.   So this tear occurred almost at the very end of her vagina?

A.   Yes.

Q.   Would that be consistent with a penis inserted into her vagina?

A.   Yes.

Q.   How would that have happened, the tearing from a penis going up inside?

A.   In this case, the penis would have been longer than the vagina, and it would be – an analogy would be putting a shovel into a sock and ripping out the end of the sock.

#68, Ex. 68, at 154-55.

As noted, the laceration began bleeding profusely again after Dr. Roberts removed the clotted blood.  The injury had cut arteries.  External bleeding had been slowed temporarily after the blood had filled the vagina and clotted as C.B. lay on the gurney, which put external pressure on the laceration.  Dr. Roberts testified, however, that C.B. "would have still continued to hemorrhage on the inside."  Dr. Roberts characterized the injury multiple times in his testimony as life threatening, given that "[t]here is a lot of pressure on an artery and the bleeding is very difficult to control."[36]

////

---

[36]#68, Ex. 68, at 182-84; see also id., at 160 ("In this case, the bleeding had to be stopped or I felt the young patient was in danger of losing her life."), 169 ("Q.  Aren't all injuries potentially life threatening when you don't know what the cause is?  A.  This injury was life threatening because she was continuing to hemorrhage."), & 172 ("In this case, it [first seeking a comprehensive past medical history] wasn't relevant because she was bleeding and I had to stop the bleeding.").  Dr. Roberts testified that, because the injury cut arteries, "there would have been immediate blood running down her legs" immediately upon the tear occurring.  Id., at 182.

-19-

With the speculum still open, Dr. Roberts told C.B. that he was going to have to sew up the laceration to stop the bleeding.  He began doing so shortly thereafter.[37]

Dr. Roberts testified that *during his examination*, he inquired further of C.B. regarding the cause of her injury:

Q.   Did you have a conversation with [C.B.] after you saw the approximately two inch tear up inside her vagina?

A.   Yeah.  To best treat [C.B.], to try to determine what had caused this, how to treat her and what was going on –

[A hearsay objection was overruled, pursuant to the medical treatment exception.]

A.   Okay.  So to better treat her, I asked her how this had occurred.  She didn't say anything.

And I said, "[C.B.], this does not appear that you fell.  There is nothing to indicate that there is an injury on the outside.  The only tear that you have is on the inside.  This does not happen when you fall.

"Can you tell me what happened?"

And after not telling me anything, remaining silent the first time, she said, I didn't want to say anything because it's my fault."

And I said, "Go on."

And she said –

[Another hearsay objection was overruled.]

A.   She said, "It's my fault that this occurred."

And I said, "And why is that?"

She said, "Because I didn't hide in the closet like I was told to do."

And I said, "Oh?  Can you go on?"

And she then said that it was her uncle that did this and that it was her fault because –

[Another hearsay objection was made and argued by counsel.]

---

[37]#68, Ex. 68, at 149.

THE COURT:   At the time that she was talking, what were you doing, Doctor?

THE WITNESS:  I was examining her.

THE COURT:   Go on. Proceed. Overruled.

Q. You can proceed.

A. She said, "My uncle did this. I didn't hide."

  And I said, "Go on."

  And she said, "He was on top of me and I began bleeding. He put me in a bathtub and then took me in to the emergency room."

Q. Dr. Roberts, was that consistent with the physical findings that you made when you did your internal examination of [C.B.]?

A. The large vagina, the cut, laceration and large introitus are very consistent with that history.

#68, Ex. 68, at 149-52.[38]

Nurse Reynolds testified that she was in the examination room during the examinations and treatment by Drs. Scheer and Roberts.  However, she testified that she was not present, for example when Dr. Roberts asked C.B. whether her stepfather had been involved.  The nurse accordingly

---

[38]Dr. Roberts testified on cross-examination that he asked whether her stepfather – as opposed to her uncle – was involved "after I finished my exam and the surturing."  Defense counsel then sought to elicit testimony from Dr. Roberts that "that was before she said anything about her uncle or stepfather doing anything to her."  Dr. Roberts responded immediately:

  A. No, that's not true.

  *During the exam* is when she told me these things about her *uncle*.

#68, Ex. 68, at 165 (emphasis added).

Dr. Roberts thus clearly and unequivocally testified that the statements in question were made during his examination of C.B.  See also *id.*, at 166-67 (the physician did not reflect the statements regarding the uncle until a report prepared later).

In further testimony, Dr. Roberts testified that the absence of external injury and the internal examination results reflecting adult-like features of the child's vagina were consistent with recurring fairly recent abuse as opposed to a single incident where she was penetrated and injured only internally. *Id.*, at 153-54, 168, 180, 185-91 & 216-25.  Such testimony is collateral to the current inquiry, which, as noted, concerns whether the statements fell within the medical treatment exception, not, *e.g.,* whether or not the medical evidence otherwise corroborated C.B.'s statements.

acknowledged that Dr. Roberts may have interviewed C.B. when she was not present.[39]  With regard to her own inquiry, Nurse Reynolds testified that she initially asked C.B. what had happened – "how she was injured, what had happened, how she came to the emergency room" – both to get a history and because "[t]hat's part of an initial assessment anyway [to see] if the patient [is] coherent, oriented."  She testified that, "little by little," her story changed.  C.B. ultimately said "that her uncle had done this to her," "that he had put his penis inside her."[40]

When asked on direct examination whether Dr. Roberts' examination had been completed when C.B. stated this, Nurse Reynolds replied: "That I don't recall.  I don't recall.  It was all simultaneous. I don't recall."[41]

On cross-examination, defense counsel sought to impeach Nurse Reynolds with a statement given to a detective conducting followup investigation on May 21, 1992, nearly three weeks after C.B.'s May 2, 1992, emergency room visit.[42]

Counsel sought in particular to establish, based on the nurse's later statement, that C.B. made the statements about her uncle to Nurse Reynolds "later that evening" after Dr. Roberts had concluded his examination.  Nurse Reynolds rejected counsel's effort to use the phrase employed by the detective in the question to suggest that she came back and spoke to C.B. "later that evening" rather than during her care:

> Q.   But you went in to talk to [C.B.] after Dr. Roberts did the examination?
>
> A.   I was with [C.B.] through the whole procedure, through everything.  I was assigned to her.
>
> Q.   Is it true it was later that evening when you went and had another conversation with [C.B.], when she said my client had done this to her?
>
> A.   When she finally said – yes, yes, it was later on.

---

[39]#68, Ex. 68, at 122.  See also note 38 (re: stepfather).

[40]#68, Ex. 68, at 110-12.

[41]#68, Ex. 68, at 112.

[42]#68, Ex. 68, at 118, lines 21-25.

1    Q.    That was after the examination had been done?

2    A.    I can't recall if it was after the examination or not.  It was
           consistent with the time that she was in the emergency room,
3          from the procedure to the actual gathering of the evidence for the
           sexual assault kit to the time that I was relieved.
4
                                . . . . .
5
     Q.    Do you remember telling Detective Anderson that later that
6          evening, you went and talked to [C.B.]?

7    A.    No I don't.

8    Q.    Would it help to refresh your recollection to review your
           statement?
9
     A.    Yes.  Why don't you do that, please?
10
           That's the same one you were just talking about, right?
11
     Q.    Later that evening.
12
     A.    That may be just a choice of words with the detective, *but it*
13         *wasn't later that evening.  It was during the time that I was on*
           *shift and my shift ended at seven p.m.*
14
                                . . . . .
15
           [Defense counsel continued to seek to impeach the nurse based
16         upon the response to the detective's question, followed thereafter
           by an objection by the prosecution.]
17
     MS. MONROE:        My objection is that she's mischaracterizing
18                      what's in this statement.

19                      Detective Anderson said: "Later that evening did you get
                        into a discussion?"
20
                        She's arguing with the witness that she did this later that
21                      evening, but the question came from Detective Anderson.

22   THE COURT:         But she said yes, so overruled.

23                                . . . . .

24   Q.    Is it true, it was after you and D. Roberts and Dr. Scheer had
           gotten together and decided the story she told wasn't consistent,
25         that you went back in to question [C.B.].

26   A.    *No, ma'am.*

27   Q.    No?

28   A.    *That is not true, no.*

-23-

. . . . .

> [The examination and testimony refer to the point at which the nurse was later gathering information for the sexual assault kit examination.]
>
> Q.   And after the doctors had expressed to you that they thought this was a sexual assault?
>
> A.   See, you're putting words in my mouth.
>
> *No, the doctors did not express to me anything.*  I was the nurse taking care of [C.B.].  It was my initial duty as her initial caretaker to make sure that everything was covered, everything.

#68, Ex. 68, at 117-21; see also *id.*, at 128-29.

Nurse Reynolds further rejected defense counsel's efforts on cross-examination to use the phrasing in the later statement to suggest that – prior to the inculpatory statements by C.B. – she told C.B. that she did not believe her.[43]

Following review of the foregoing and related evidence, the Court, quite clearly, is unable to say that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the state supreme court's factual finding is supported by the record.  *Taylor, supra.*

Petitioner's factual argument to the contrary is based on two flawed constructs.

The first flawed construct is based upon a detective's use of the phrase "later in the evening" in a question three weeks after C.B.'s presentation at the emergency room.

The  evidence instead reflects that the *entirety* of Nurse Reynolds' interaction with C.B. instead was likely less than thirty minutes in duration and at most no more than sixty minutes.  C.B. presented to triage intake – not Nurse Reynolds – at approximately 6:30 p.m., and the nurse's shift ended at either 7:00 p.m. or at the latest 7:30 p.m.  During that time: (a) C.B. was triaged at the intake desk and then carried back to the nurse's examining room; (b) the nurse conducted an initial triage assessment and then called the emergency room physician in to evaluate and treat C.B.; (c) the emergency room

---

[43]See #68, Ex. 68, at 115-17, 121-22 & 127 (the nurse distinguished the conclusions that she relayed later to the detective from what she said instead to C.B.).  As the Court discusses, *infra*, the *manner* in which a medical provider questions a patient as to her pertinent history – whether in a manner *arguendo* consistent with best practices or even in a suggestive manner – is not necessarily determinative as to whether that questioning was for and reasonably pertinent to medical diagnosis and treatment.

physician examined the patient and sought to stabilize her, including with the administration of an IV; (d) the ER physician called in a gynecologist from another part of the hospital;[44] (e) the gynecologist conducted an examination of the patient, inquired further as to relevant history, and sutured an extensive internal laceration that was causing life-threatening arterial bleeding; and (f) after the child had abandoned the implausible cover story of "falling down the stairs" and gave a history that instead was consistent with the objective medical findings, the nurse conducted a sexual assault kit examination, which then involved further inquiry into the specifics of the sexual assault.[45]  The Supreme Court of Nevada was not required to ignore the actual time line and Nurse Reynold's emphatic rejection of defense counsel's suggestions at trial simply because a detective used the phrase "later in the evening" three weeks after the fact.  The state supreme court's factual finding instead is supported by abundant trial evidence strongly supporting the conclusion that the victim's statements to Nurse Reynolds were made *during* the nurse's continuing close care of the victim.

The second flawed construct is that a medical provider's inquiry seeking "the truth" – and/or an inquiry conducted in an *arguendo* imperfect or even suggestive manner – necessarily cannot be an inquiry pertinent to medical diagnosis and treatment.

Quite simply, an inquiry seeking a true statement of medical history, inception of symptoms and their cause *is* an inquiry *directly* pertinent to medical diagnosis and treatment – particularly where the initial history given is contradicted by the objective findings.  Petitioner's supposition that – after initially being told by the victim that she fell down the stairs – the nurse left her role as a health care provider when she inquired further as to the true cause of the child's injury is completely wrong.  The truth had medical relevance over and above the – for that context – collateral legal relevance.  Moreover, it in truth does not matter whether the manner of the nurse's questioning was *arguendo* consistent with preferred or best medical practices or even was suggestive.  A medical provider *arguendo* pounding the table and demanding the truth may not be following the best practices in such

---

[44]See #68, Ex. 68, at 143 & 178 (Dr. Roberts was called down to the ER from labor and delivery).

[45]See #68, Ex. 68, at 120-21 & 133-36 (regarding Nurse Reynold's specific inquiries during the sexual assault kit examination at the end of the sequence of events – after C.B. had said to the nurse that "her uncle had done this to her," as opposed to falling down the stairs).

a setting.  However, that does not necessitate a conclusion that their perhaps less than optimal manner of seeking a true medical history means that their inquiry was not pertinent to diagnosis and treatment of the patient.[46]

The state supreme court's finding that C.B.'s statements to Nurse Reynolds were pertinent to diagnosis and treatment thus was not an unreasonable determination of fact and is entitled on the record herein to a presumption of correctness under 28 U.S.C. § 2254(e)(1).

Against that factual backdrop, the state supreme court's holding that C.B.'s statements to Nurse Reynolds fell within the medical treatment exception hardly was a "creative interpretation" of the exception.  Petitioner, again, seeks to create a false dichotomy between determining the truth on the one hand and medical diagnosis and treatment on the other.  It was part of both medical diagnosis and treatment *to determine the truth* in order to properly diagnose and treat the child.  As has been recognized in other cases  – including in Ninth Circuit cases involving analogous factual settings – a medical provider has a number of valid *medical* interests in determining the truth in such a context.[47] Those valid medical interests indisputably include determining whether a nine-year-old child potential sexual assault victim is in a situation potentially involving continuing repeated sexual abuse. Petitioner's inherent implicit suggestion that a medical provider in this context instead must in essence "sew 'em up and send 'em back out" without questioning a clearly implausible "I fell down the stairs" story is based upon an overly narrow view of the medical provider's function in this context.

////

---

[46]Admissibility and weight of course are distinct concepts with regard to the hypothetical.  *Accord George*, 960 F.2d at 100 ("Focusing on the personal characteristics of the victim is inconsistent with the categorical approach to "firmly rooted" hearsay exceptions adopted by the Supreme Court. . . . .  As a general matter, the age of the child and her other personal characteristics go to the weight of the hearsay statements rather than their admissibility.")

[47]*See, e.g., United States v. JDT*, ___ F.3d ___, 2014 WL 3906767, at *17-19 (9th Cir. Aug. 12, 2014)(medical providers' inquiries seeking to determine whether sexual abuse was involved for purposes of further treatment and monitoring, including associated counseling, fell within exception); *United States v. Lukashov*, 694 F.3d 1107, 1111-15 (9th Cir. 2012), *cert. denied*, 133 S.Ct. 1744 (2013)(social worker's questioning was for the purpose of and reasonably pertinent to medical diagnosis and treatment even though the interview was conducted with a police officer and a doctor watching from behind a window); *George*, 960 F.2d at 99-100 (statements to doctor five months after the abuse were for purpose of diagnosis and treatment, including, *inter alia*, with respect to what treatment might be required for emotional and psychological injuries based upon the identity of the abuser and with respect to possible diagnosis and treatment of sexually transmitted diseases).

1    The burden is not on respondents to establish that the state supreme court's *interpretation* –

2  creative or otherwise – itself was "firmly rooted" *in* the medical treatment hearsay exception.[48]  The

3  burden instead is on petitioner to demonstrate that the court's holding that the statements fell *within* a

4  firmly rooted hearsay exception – which this exception indisputably was under then-controlling

5  Supreme Court law – was contrary to or an objectively unreasonable application of clearly established

6  federal law as determined by the United States Supreme Court.  Petitioner has not carried that burden

7  as to the statements made to Nurse Reynolds.

8    With regard to the statements made to Dr. Roberts, the Court has no doubt, on a *de novo* review,

9  that the statements fell within the medical treatment hearsay exception and that their admission thus did

10 not violate the Confrontation Clause under the then-governing law.

11   Although the Court's *de novo* review is not limited to the law at the time of the state supreme

12 court's decision on direct appeal, the current governing law establishes that *Crawford* does not apply

13 retroactively.  *Roberts* thus governs the issue also as to the statements to Dr. Roberts.  *Bockting, supra*.

14   The trial record readily reflects that the statements to Dr. Roberts were made while the doctor

15 was examining and treating the patient and were obtained to secure a true medical history.[49]  This child,

16 clearly, did not fall down the stairs.  The physician was duty bound to inquire further.

17   The Court's foregoing discussion of the operation of the medical treatment hearsay exception

18 with respect to the statements made to Nurse Reynolds applies with even greater force to the statements

19 made to Dr. Roberts.

20   No Confrontation Clause or other constitutional violation is presented on the showing made.

21   Ground 2 does not provide a basis for federal habeas review.

22   **Ground 6:   *Alleged Admission of Portions of Physician's Report***

23   In Ground 6 as alleged in the first counseled amended petition, petitioner alleges that he was

24 denied a right "to due process" under the Fifth, Sixth and Fourteenth Amendments by the admission

25 _____

26   [48]*Cf.* #87, at 9, lines 1-2, & 10, lines 3-4 (petitioner frames the issue as one purportedly requiring that the state
supreme court's interpretation of the exception – as opposed to the exception itself – must be "firmly rooted" to avoid a

27 Confrontation Clause violation).

28   [49]See text, *supra*, at 14-24.

1   of parts of a report by Dr. William Gordon, M.D., who passed away prior to trial.  Petitioner alleges that

2   "the first four paragraphs of Dr. Gordon's report (Ex. 42, at exhibit A) were not admissible under

3   hearsay rules because the information constituted double and triple hearsay."  Petitioner alleges that

4   "[t]he admission of these statements resulted in bolstering of the other testimony given without any

5   ability for Mr. Koerschner to cross-examine the proponent of the hearsay."[50]

6          In the answer as to Ground 6, respondents – in contrast to an earlier-filed answer as to Ground

7   2 – timely maintain that the ground should be limited to the claims specifically alleged within the

8   federal pleading.  Respondents speak to possible Confrontation Clause aspects only because the Court

9   – seeking then to bring all possible aspects of the case to a resolution – ordered them to do so.[51]

10         The Court is persuaded by respondents' argument.  Habeas pleading is not notice pleading, and

11  habeas claims must be alleged with specificity both as to the legal and factual basis for a claim.  *E.g.,*

12  *Mayle,* 545 U.S. at 655.  Petitioner urges in the reply that a claim that alleges the improper admission

13  of hearsay evidence and that invokes the Sixth Amendment "can easily be understood" to involve the

14  Confrontation Clause "even if it doesn't specifically contain the phrase 'confrontation clause.'"[52]  The

15  Court is not liberally construing a *pro se* pleading.  The first counseled amended petition was prepared

16  by the Federal Public Defender.  Counsel should understand the pleading burden under Rule 2 of the

17  Rules Governing Section 2254 Cases.  If counsel did not specifically allege a Confrontation Clause

18  claim, one is not there.[53]

19         The Court referred in the above-referenced order to the prospect of relation back.  However,

20  there nonetheless is no claim on a factual and/or legal basis before the Court other than what is alleged

---

22  [50]#63, at 14-15.  The first counseled amended petition together with the answer and reply as to Grounds 6, 7
23  and 8(a) may be found in the record at ## 63, 117 & 118 respectively.

24  [51]#113, at 5.

25  [52]#118, at 8.

26  [53]The Court is not persuaded by petitioner's argument that he understands "due process" to incorporate Sixth
27  Amendment protections under the Fourteenth Amendment. #118, at 8 n.2.  Habeas claims must be pled with specificity.
    Relying on the nearly wholesale incorporation of the Bill of Rights via the Due Process Clause of the Fourteenth
28  Amendment to state a specific constitutional claim does not suffice.  The represented petitioner did not allege a
    Confrontation Clause claim.

in the first counseled amended petition.  No further amending petition has been presented timely, and it is established law that the pleadings may not be amended by allegations or arguments in a reply. *Cacoperdo v. Demosthenes*, 27 F.3d 504, 507 (9th Cir. 1994).  What the Court stated – on the other side of the coin – in the discussion of Ground 2 applies with equal force to petitioner in this instance.  It certainly is past time to conclusively resolve this case, and it is too late in the case for seeking procedural relief as to claims or arguments not timely and properly presented previously.  A party's failure to present claims and arguments at the time and in the manner provided for in a scheduling order generally leads to an inability to pursue the claim or argument.

The Court accordingly addresses only the factual and legal claims alleged with specificity in Ground 6.  The ground asserts only a claim of a denial of a right to due process based upon the alleged admission of portions of a report by Dr. Gordon.  No claim on any other legal or factual basis is before the Court.  Under the prior orders herein, the Court proceeds on the basis that the ground was exhausted in an original petition for extraordinary relief in the state supreme court.[54]  As discussed previously herein, a resolution on the merits, including a summary rejection on the merits, is subject to deferential review under AEDPA.  *Richter, supra*.

The state supreme court's August 23, 2005, rejection of a due process claim corresponding to Ground 6 was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court on that date.

In the reply, petitioner refers to discussion of Dr. Gordon's report in the trial testimony of a consulting expert Dr. Troy Reyna, M.D., a pediatric surgeon with a specialty in child sexual abuse cases.  Petitioner presents eleven pages of specific factual allegations and argument – in the reply – seeking to establish that the expert witness was improperly allowed to refer to hearsay material in Dr. Gordon's report in violation of the Confrontation Clause.  In Ground 6 in the first counseled amended petition, the represented petitioner presented nine *lines* of conclusory allegations regarding the allegedly erroneous admission of portions of Dr. Gordon's report in violation of petitioner's right to due process.  No mention was made therein of the Confrontation Clause, of Dr. Reyna, or of alleged improper

_____

[54]See #113, at 4, lines 18-20, referring to Grounds 1, 6, 7 and 8(a).

-29-

1   admission of hearsay evidence through an expert's testimony.  The claim argued in the reply is not the

2   claim alleged in Ground 6.  A represented habeas petitioner clearly has the capacity to allege the

3   different claim argued in the reply instead actually in the pleadings.  Habeas claims must be alleged with

4   specificity.

5       The claim argued in the reply therefore is not before the Court on the pleadings actually alleged

6   by petitioner.

7       Even if the Court were to read the counseled amended pleading with more liberality than

8   perhaps might apply even to a pleading prepared by a layman with regard to the expanded factual

9   allegations, petitioner has not carried his burden under AEDPA.  He has not established that the state

10  supreme court's rejection of a due process claim in this regard was either contrary to or an objectively

11  unreasonable application of clearly established federal law as determined by the Supreme Court.

12      On direct, Dr. Reyna stated that "[a] couple of physicians made note of the fact that she seemed

13  to live in a kind of dream world and wasn't particularly affected by this."  The trial court overruled a

14  defense objection to the testimony, stating at the 1997 trial: "Counsel, if he's an expert, he can use other

15  doctors' reports or anything, hearsay, whatever."[55]  On cross-examination, defense counsel specifically

16  referenced Dr. Gordon for the first time and referred to portions of his report regarding the child's state

17  of mind or demeanor.  Defense counsel sought to establish that "Dr. Gordon stated that this child wasn't

18  acting like a child that had been sexually abused."[56]  Petitioner contends that the State then improperly

19  was allowed to elicit testimony from Dr. Reyna on redirect regarding other portions of Dr. Gordon's

20  report establishing that Dr. Gordon's actual impression – as opposed to his description of the child's

21  demeanor – was one of "severe sexual abuse."  Petitioner quotes in the reply testimony by Dr. Reyna

22  quoting, over a hearsay objection, Dr. Gordon's impression of "[s]evere sexual abuse by, quote, an

23  uncle, who is a truck driver, unquote."  Two questions later, the trial court *sua sponte* instructed the jury

24

25      [55]#67, Ex. 67, at 211-12.  Petitioner asserts in the reply – without record citation – that "[o]n direct, Dr. Reyna
    made countless references to what other nurses and physicians had stated in their reports." #118, at 5.  Petitioner has the
26  burden of production, proof and persuasion on federal habeas review.  Such vague, unsupported references establish
    nothing.  Further to the point, Ground 6 is directed to the admission of portions of *Dr. Gordon's report*, not any and all
27  statements by *other* medical providers to which *Dr. Reyna* perhaps referred in his expert testimony.

28      [56]#67, Ex. 67, at 223-25.

-30-

1    to disregard the "part wherein his impression he stated she has an uncle who is a truck driver" but that

2    the jury could consider the physician's impression of severe sexual abuse.[57]

3           Petitioner does not cite a single holding of the United States Supreme Court establishing that

4    the foregoing expert testimony violated petitioner's right to due process.  When a petitioner relies upon

5    a broad generalized rule, AEDPA review is at its most deferential:

6                      A state court's determination that a claim lacks merit precludes
                    federal habeas relief so long as "fairminded jurists could disagree" on the
7                   correctness of the state court's decision.  *Yarborough v. Alvarado*, 541
                    U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this
8                   Court has explained, "[E]valuating whether a rule application was
                    unreasonable requires considering the rule's specificity.  The more
9                   general the rule, the more leeway courts have in reaching outcomes in
                    case-by-case determinations."  *Ibid.*  "[I]t is not an unreasonable
10                  application of clearly established Federal law for a state court to decline
                    to apply a specific legal rule that has not been squarely established by
11                  this Court."  *Knowles v. Mirzayance*, 556 U.S. ——, ——, 129 S.Ct.
                    1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks
12                  omitted).

13   *Richter*, 562 U.S. at 786.  Relying broadly upon "due process" without any apposite Supreme Court due

14   process precedent is about as general of a rule as a petitioner could rely upon – leading to about the most

15   deferential of review under AEDPA.  *See also White v. Woodall*, 134 S.Ct. 1697 (2014)(if a habeas

16   court must extend a rationale before it can apply it to the case at hand, then by definition the rationale

17   was not clearly established at the time of the state court decision); *Moore v. Helling*, ___ F.3d ___, 2014

18   WL 3973407 (9th Cir. Aug. 15, 2014)(discussing the implications of *Woodall* at length).

19          In the present case, petitioner seeks – in factual and legal argument in the reply going well

20   beyond the actual pleadings – to establish a violation of the due process protection invoked in Ground

21   6 based upon the State being allowed to reference what an examining physician's actual diagnosis was

22   after the defense referred specifically to the physician's report and at least intimated that the physician

23   _____

24          [57]#67, Ex. 67, at 253-55.  That is the only allegedly improper testimony referenced in the reply, a reference by
     an expert medical witness to another physician's impression.  Petitioner referred conclusorily in the pleadings to "double
25   and triple hearsay."  #63, at 14-15.  No multiple hearsay was contained in the testimony referenced by petitioner in the
     reply, other than the reference to the child's statement regarding the uncle, which the jury promptly was instructed to
26   disregard.  The only hearsay was Dr. Reyna saying what Dr. Gordon said in his report as to what his impression was.
     Petitioner's claim – in the reply rather than the pleadings – perhaps posits that an expert medical witness cannot refer to
27   an examining physician's impression of a patient's condition because the other physician's impression – *i.e.*, diagnosis –
     may be based in part on what others told him.  It would be a strange rule indeed if an expert medical witness could not
28   discuss the diagnosis reached by another physician who examined the patient.

                                                      -31-

1    concluded otherwise.  The state supreme court's rejection of that claim was neither contrary to or an

2    unreasonable application of Supreme Court precedent at the time of the court's decision.  This Court

3    would hold the same even on a *de novo* review.  This Court indeed would have admitted the testimony

4    over a trial objection actually based on due process, as nothing in the Due Process Clause enables a

5    defendant to selectively present – in truth misrepresent – a doctor's opinion in such a manner.[58]

6         Finally, even if the Court were to disregard the fact that there is no Confrontation Clause claim

7    alleged in Ground 6 in the pleadings, a rejection of such a claim was neither contrary to nor an

8    objectively unreasonable application of clearly established federal law.

9         Petitioner posits that "there is no 'firmly rooted' exception that allows an expert to read

10   inadmissible hearsay into evidence."  He relies upon federal appellate decisions – and primarily from

11   civil cases – addressing the extent to which an expert can and cannot refer to hearsay in testimony under

12   the Federal Rules of Evidence.

13        That is not how deferential review under AEDPA works.  Petitioner cites no apposite holdings

14   of the United States Supreme Court clearly establishing that the state supreme court could not hold in

15   2005 that admission of Dr. Reyna's foregoing testimony did not fall within a firmly rooted exception

16   to the hearsay rule.  The Eleventh Circuit indeed held in 2002 that hearsay evidence relied upon by an

17   expert in forming his opinion, so long as it is of a type regularly relied upon by experts in that field, fell

18   within a firmly rooted exception to the hearsay rule.  *United States v. Brown*, 299 F.3d 1252, 1258 (11th

19   Cir. 2002), *vacated for further consideration*, 538 U.S. 1010 (2003), *opinion reinstated by* 342 F.3d

20   1245, 1246 (11th Cir.), *cert. denied*, 543 U.S. 823 (2004).  Here, the defense sought to use Dr. Gordon's

21   report to undercut Dr. Reyna's expert opinion testimony, and the State came back on redirect seeking

22   to establish that the examining physician's report that the consulting medical expert had referred to in

23   reaching his opinion instead supported that opinion.  Federal appellate decisions applying the Federal

24   Rules of Evidence in myriad factual settings do not establish on deferential AEDPA review that the

25

26        [58]While the state trial court instructed the jury to disregard the quoted statement by the child as to the uncle,
     testimony by Dr. Roberts and Nurse Reynolds as to similar statements by the child later was admitted.  The Court has
27   rejected petitioner's claims in Ground 2 based upon the Confrontation Clause.  It would be most difficult to conclude
     that – with Ground 2 being rejected – the reference to the uncle in quotes in Dr. Gordon's report deprived petitioner of a
28   fair trial and due process, with or without the instruction to the jury to disregard the statement.

1   state supreme court's rejection of a Confrontation Clause claim on these facts was contrary to or an

2   unreasonable application of clearly established federal law under *Supreme Court* precedent in 2005.[59]

3          Ground 6 does not provide a basis for federal habeas relief.

4   ***Ground 7(a): Effective Assistance – Failure of Trial Counsel to Pursue Federal Ground 1***

5          In Ground 7(a), petitioner alleges that he was denied effective assistance of trial counsel when

6   counsel did not pursue the claims alleged in federal Ground 1.

7          On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test

8   of *Strickland v. Washington*, 466 U.S. 668 (1984). He must demonstrate that: (1) counsel's performance

9   fell below an objective standard of reasonableness; and (2) counsel's defective performance caused

10  actual prejudice. On the performance prong, the issue is not what counsel might have done differently

11  but rather is whether counsel's decisions were reasonable from his perspective at the time. The court

12  starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct.

13  On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's

14  unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v.*

15  *Woodford*, 327 F.3d 799, 807-08 (9th Cir. 2003). While surmounting *Strickland*'s high bar is "never

16  an easy task," federal habeas review is "doubly deferential" in a case governed by AEDPA. In such

17  cases, the reviewing court must take a "highly deferential" look at counsel's performance through the

18  also "highly deferential" lens of § 2254(d). *Pinholster*, 131 S.Ct. at 1403 & 1410.

19         Under the Court's prior holdings herein, Ground 7(a) was exhausted by the state supreme court's

20  rejection of petitioner's original petition for extraordinary relief. The state supreme court's summary

21  rejection of the claim is subject to deferential AEDPA review. *Richter, supra*. For the reasons

22  discussed previously as to Ground 1,[60] with the exception of the reference to *Stone v. Powell*, the Court

23  holds that the state supreme court's rejection of this claim was neither contrary to nor an objectively

24  _____

25  [59]Petitioner argues further that Dr. Reyna's testimony referring to Dr. Gordon's report lacked indicia of
    reliability. As discussed previously as to Ground 2, if the reviewing court concludes that the evidence fell within a

26  firmly rooted hearsay exception, that is the end of the inquiry as to reliability. *E.g., George*, 960 F.3d at 100 (the
    reliability requirement is satisfied – without further analysis – if the statement falls within a firmly rooted exception).

27

28  [60]In arguing Ground 7(a) in the reply, petitioner states that he "has nothing to add to this claim beyond what he
    has stated in earlier pleadings." #118, at 16. See also #70, Ex. 114, at 3-4 (related discussion by state supreme court).

1   unreasonable application of *Strickland*.  Petitioner can demonstrate neither deficient performance nor

2   resulting prejudice based upon defense counsel's failure to pursue claims that would have provided no

3   basis for precluding a conviction of petitioner.

4       Ground 7(a) does not provide a basis for federal habeas relief.

5       ***Ground 7(b): Effective Assistance – Failure to Object to Cross-Examination of Petitioner***

6       In Ground 7(b), petitioner alleges that he was denied effective assistance of trial counsel when

7   counsel failed to object to the State's – appropriately veiled – use of a prior presentence report in the

8   case (from his earlier conviction in the case on a plea that was vacated) to impeach Koerschner at trial

9   with regard to his employment history.

10      On direct examination, Koerschner outlined his employment history in an effort apparently to

11  establish, *inter alia*, that he was not at home for long periods of time during the time that C.B. was

12  there.[61]   The defense apparently sought to establish that Koerschner was not home extensively in

13  response to the medical evidence reflecting that the child victim had been subjected to sustained sexual

14  abuse.

15      The State then inquired about Koerschner's outline of his employment history – which formed

16  a lengthy portion of the direct examination – on cross-examination.   The State asked whether

17  Koerschner had been unemployed for "about a month" after leaving Trench Plate Rental.  He responded

18  that he went directly to Andress Trucking Company from Trench Plate Rental because the reason he

19  left Trench Plate Rental was to work at Andress Trucking Company.   When asked whether he went

20  directly from the old job to the new job he responded: "Absolutely."[62]

21      Petitioner premises Ground 7(b) upon the following exchange during the State's cross-

22  examination of Koerschner:

23          Q.      And you didn't tell anybody you went to work for Andress
                    Trucking company from June of 1991 until August of 1991?
24
            MS. CONNOLLY:      Judge, I'm going to object.  Tell anybody; is there
25                             somebody in specific she's referring to?

26  _____

27      [61]#69, Ex. 70, at 13-24.

28      [62]#69, Ex. 70, at 52-55.

-34-

1     MS. MONROE:     Yes, there is.

2     THE COURT:     Overruled.

3     MS. MONROE:     Do you remember ever having a conversation with a Robert E. Moorehead?

4

5     A.    Moorehead?  No.

    Q.    I'm going to show you a copy of a statement.  Do you remember

6 this document, Mr. Koerschner, *without going into what it is*?

7     A.    Yes, I do.

8     Q.    And do you see the signature on this document, Robert E. Moorehead?

9

10     A.    Yes, I do.

    Q.    So you would have have had a conversation with Mr.

11 Moorehead?

12     A.    Yes.

13     Q.    So now you remember that?

14     A.    It's possible.  It's very vague.

15     Q.    Do you remember him asking you about your employment status?

16

17     A.    Okay.  And since I didn't have none of my records with me, all I was relying on was my recollection.

18     Q.    Well, what was your recollection when you told Mr. Moorehead about your employment with Trench Plate?

19

20     A.    What was my recollection?  It was from memory only.

21     Q.    Mr. Koerschner, what were the dates that you told Mr. Moorehead from memory only that you worked with Trench Plate?

22

23     A.    Somewhere around June 1 of '91 and the 6th of '91, but this is incorrect.

24     Q.    But you didn't tell Mr. Moorehead that, though, when you gave him that information?

25

26     A.    No.  I was not very cooperative with him, either.

27 #69, Ex. 70, at 56-57 (emphasis added).

28     */ / / /*

1    Under the Court's prior holdings herein, Ground 7(b) was exhausted by the state supreme court's

2 rejection of petitioner's original petition for extraordinary relief.  The state supreme court's summary

3 rejection of the claim is subject to deferential AEDPA review.  *Richter, supra.*

4    Petitioner has failed to establish that the state supreme court's rejection of this claim was either

5 contrary to or an objectively unreasonable application of *Strickland.*

6    Petitioner alleges in the pleadings that the pre-sentence report was not a direct statement of Mr.

7 Koerschner and was not a statement made under oath.  Petitioner cites no case law establishing that a

8 criminal defendant testifying at trial can be impeached only by direct statements rather than statements

9 reflected in a report of what he said.  Petitioner cites no case law establishing that a criminal defendant

10 testifying at trial can be impeached only by statements made under oath.

11    Petitioner further alleges in the pleadings that the – in some as-yet unestablished sense –[63]

12 improper impeachment left the impression that he had not testified truthfully regarding his employment.

13 That no doubt was the State's intent.  Koerschner took the stand and testified as to his employment

14 history, in an effort apparently to seek to establish that he was not present to commit the sustained

15 sexual abuse reflected by the medical evidence.  Petitioner cites no case law establishing that a criminal

16 defendant testifying at trial cannot be impeached both as the truth of his testimony on direct and as to

17 his credibility generally.  Petitioner cites no case law establishing that a criminal defendant can take the

18 stand and testify but not then be "prejudiced" by having to answer to prior contrary statements.

19 Petitioner cites  no case law establishing that a defense lawyer can interpose a viable objection that

20 would protect him from such prejudice after taking the stand.

21    Petitioner maintains further in the reply that he was improperly impeached on a "collateral"

22 matter.  Koerschner provided extensive testimony in this regard on direct and the impeachment could

23 not be regarded to be on a "collateral" point.  However, even if it was, that then would tend to cut

24 against petitioner's claim that he was substantially prejudiced by impeachment on such a collateral

25 matter.

26 _____

27    [63]In the reply, petitioner cites to his conclusory allegation from the first counseled amended petition that the questioning was inflammatory and improper. #118, at 18.  Such circular bootstrapping repetition of a conclusory

28 allegation establishes nothing.  Petitioner has the burden of both proof and persuasion on federal habeas review.

1       The state supreme court accordingly readily could find under *Strickland* that petitioner could

2   not show deficient performance, because there was no viable objection to present to the impeachment,

3   with the State not revealing the nature of the impeaching document.[64]  Such a holding is subject to

4   doubly deferential review under AEDPA.  *Pinhoster, supra.*  The state supreme court accordingly

5   readily could find further that petitioner could not establish prejudice – *under Strickland* – due to the

6   failure to object, given that there was no viable objection to raise.  Moreover, the state supreme court

7   readily could conclude, against the backdrop of the evidence canvassed *supra* under Ground 2, that even

8   if defense counsel *arguendo* could have excluded the impeachment – on some viable basis not actually

9   established  herein – there was not a reasonable probability of a different outcome at trial.[65]

10      Ground 7(b) does not provide a basis for federal habeas relief.

11      ***Ground 8(a): Effective Assistance – Alleged Failure to "Federalize" Appeal Issues***

12      In Ground 8(a), petitioner alleges that he was denied effective assistance of appellate counsel

13  when counsel allegedly did not "federalize" unspecified claims on direct appeal.

14      Under the Court's prior holdings herein, Ground 8(a) was exhausted by the state supreme court's

15  rejection of petitioner's original petition for extraordinary relief.  The state supreme court's summary

16  rejection of the claim is subject to deferential AEDPA review.  *Richter, supra.*

17      Petitioner has failed to establish that the state supreme court's rejection of this claim was either

18  contrary to or an objectively unreasonable application of *Strickland*.

19

---

20  [64]Petitioner acknowledges that the source of the prior statement was not revealed, but he maintains that the
21  "jury was left to infer the worst" because it was not told who Mr. Moorehead was.  #118, at 19.  Evidence is presented in
    a veiled manner in state and federal criminal cases on countless occasions precisely to avoid prejudicing a criminal
22  defendant.  Petitioner's argument that he was prejudiced because the State did not reveal the context of the statement has
    no persuasive value.

23  [65]Petitioner urges that the state court's rejection of the claim is not entitled to deference because the state
24  supreme court did not hold an evidentiary hearing on the original petition filed in that court. #118, at 18.  Petitioner cites
    no *apposite* law establishing that an evidentiary hearing was required on this claim.  *On the face of the record, petitioner*
25  *has not established a basis for a viable objection to the impeachment.*  Petitioner took the stand.  He was subject to
    being impeached by his prior statements that were inconsistent with his testimony.  A state court is not required to hold
26  an evidentiary hearing on a bare, baseless claim presented in order for deferential AEDPA review to apply.  This is a
    bare and baseless claim, supported by conclusory assertions with no supporting authority establishing a basis for a viable
27  objection.  This Court in any event would reject the claim on *de novo* review, without holding an evidentiary hearing.
    There is no occasion to hear testimony from defense counsel as to counsel's strategic reason for not raising a baseless
28  objection.

1    When evaluating claims of ineffective assistance of appellate counsel, the performance and

2  prejudice prongs of the *Strickland* standard partially overlap.  *E.g., Bailey v. Newland*, 263 F.3d 1022,

3  1028-29 (9th Cir. 2001); *Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989).  Effective appellate

4  advocacy requires weeding out weaker issues with less likelihood of success.  The failure to present a

5  weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to

6  the client for the same reason – because the omitted issue has little or no likelihood of success on

7  appeal.  *Id.*

8    The rejection of a bare claim such as in Ground 6 was neither contrary to nor an unreasonable

9  application of clearly established federal law.  Conclusory allegations, *inter alia*, that "the failure to

10 raise all of Mr. Koerschner's federal claims was below the standard for effective counsel and prevented

11 Mr. Koerschner from success on appeal" present no specifics.  Such conclusory allegations do not tend

12 to establish either deficient performance – on a doubly deferential AEDPA review – or resulting

13 prejudice with regard to the direct appeal.  There is little or no likelihood that the federal substantive

14 claims addressed previously in this order – if *arguendo* federalized where they *arguendo* had not been

15 on direct appeal – would have succeeded on appeal.

16    Petitioner otherwise cites no apposite United States Supreme Court precedent clearly

17 establishing that appellate counsel on a state criminal direct appeal provides ineffective assistance of

18 counsel if he does not "federalize" claims on direct appeal specifically to preserve claims for later

19 federal habeas review.  Appellate counsel is appointed to seek to secure a reversal on direct appeal, not

20 to seek federal habeas relief.  Winning the appeal is the objective, not exhausting claims for federal

21 habeas review.  No law clearly established by Supreme Court precedent establishes that appellate

22 counsel's obligations run beyond the proceeding for which he is appointed.  Indeed, the focus on the

23 prejudice prong of the *Strickland* analysis would indicate that the proper focus instead is on whether

24 there is a reasonable probability that the result of "the proceeding" – *i.e.*, the direct appeal – would have

25 been different.  In the absence of apposite supporting Supreme Court precedent on this point, petitioner

26 simply cannot establish a viable claim on deferential AEDPA review based upon appellate counsel

27 failing to "federalize" claims so that they later may be asserted on federal habeas review.

28    / / / /

1    Petitioner in any event appears to concede in the reply that there is no viable claim in this latter

2    regard because the Court has not held Grounds 1 through 6 to be unexhausted.  He states that he thus

3    does not believe it necessary to address Ground 8(a) in the reply.

4    Ground 8(a) does not provide a basis for federal habeas relief.

5    ***Ground 8(b): Effective Assistance – Failure to Raise a Claim of Cumulative Error on Appeal***

6    In Ground 8(b), petitioner alleges that he was denied effective assistance of appellate counsel

7    when counsel did not raise a claim of cumulative error on direct appeal.  Petitioner refers, *inter alia*,

8    to alleged cumulative error based on appellate claims regarding admission of hearsay statements, a

9    denial of a request for a psychological examination of the victim, and exclusion of evidence that the

10   victim allegedly previously had been abused.  He also references unspecified claims of alleged

11   ineffective assistance of counsel.[66]

12   In its July 25, 2006, order of affirmance on state post-conviction review, the Supreme Court of

13   Nevada rejected the cumulative error claim presented to that court on the following grounds:

> Koerschner further complains that appellate counsel was
> ineffective for failing to argue that the cumulative effect of the errors
> alleged warranted reversal of his conviction.  Insofar as he failed to
> adequately support many of his ineffective-assistance-of- counsel claims
> or otherwise show error, we conclude that he did not demonstrate
> cumulative error.  Therefore, the district court did not err in denying this
> claim.

18   #70, Ex. 114, at 8.

19   The state supreme court's rejection of the claim presented to that court was neither contrary to

20   nor an objectively unreasonable application of clearly established federal law.

21   At the outset, the claim is one of *ineffective assistance of appellate counsel on direct appeal*.

22   The claim is not an all encompassing substantive claim of cumulative error.  It is unlikely that appellate

23   counsel would have been able to assert a claim of cumulative error at that juncture based upon claims

24   of ineffective assistance of trial counsel as well as substantive claims.

25   / / / /

26

27

28   _____

   [66]#63, at 14-15.  The first counseled amended petition together with the answer and reply as to Ground 8(b)
   may be found in the record at ## 63, 86 and 87 respectively.

1    With regard to the substantive claims on direct appeal, the Supreme Court of Nevada found no

2    error in the first instance.  *Koerschner*, *supra*.  The court's rejection of the claim – which was of

3    ineffective assistance of appellate counsel – for failing to raise a cumulative error claim on direct appeal

4    thus hardly was either contrary to or an  unreasonable application of clearly established federal law.

5    Petitioner cannot establish, *inter alia*, prejudice under *Strickland* based upon appellate counsel's failure

6    to raise a cumulative error claim when the appellate court rejected all of the underlying claims of error.

7    The issue under *Strickland* is not whether appellate counsel preserved a claim for later review but

8    instead is whether there was a reasonable probability of a different outcome *on the appeal* if a

9    cumulative error claim was raised.  There was no such possibility on an appeal where the court rejected

10   all of the individual claims of error.  *Cf. Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011)("Because

11   we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

12   The rejection of the ineffective-assistance claim clearly withstands review under AEDPA.[67]

13   Petitioner's reliance upon the state supreme court's earlier decision in *Sipsas v. State*, 102 Nev.

14   119, 716 P.2d 231 (1986), is wholly misplaced.

15   Petitioner first relies upon *Sipsas* for the proposition that "although individual errors may be

16   harmless, the cumulative effect of multiple errors may deprive a defendant of a constitutional right to

17   a fair trial."[68]  The Supreme Court of Nevada did not hold that there was *harmless* error on direct appeal.

18   It held that there was *no* error.  There thus was no error to cumulate when it reviewed a claim that

19   appellate counsel was ineffective for failing to raise a cumulative error claim.

20   Petitioner thereafter asserts that *Sipsas* establishes that "such a cumulative error claim may

21   compel it to grant relief in a case where it could not grant relief on the individual claims alone."[69]

22   Nothing in *Sipsas* establishes that a cumulative error claim may compel relief where the court could not

23

24   [67]Nor did the state high court find any error in the claims presented on state post-conviction review, as to many
     of which no supporting record material was provided.  Thus, even if the Court were to consider a strained scenario under

25   which *direct appeal* counsel could be found to be ineffective for failing to raise a claim of cumulative error based on,
     *inter alia*, claims of ineffective assistance of trial counsel that cannot be raised on direct appeal, the analysis in the text

26   applies.

27   [68]#87, at 11.

28   [69]#87, at 16.

grant relief on the individual claims *because it found no error*. *Sipsas* spoke to a circumstance where the court found error on individual claims. Nothing in *Sipsas* establishes that the Supreme Court of Nevada unreasonably applied *Strickland* in rejecting petitioner's claim that appellate counsel was ineffective for failing to raise a cumulative error claim on a direct appeal where the state supreme court found no error on any individual claim.

In the reply, petitioner seeks to relitigate direct appeal claims regarding: (a) the admission of hearsay statements to medical providers, (b) denial of a psychological examination of the victim, (c) exclusion of evidence of alleged prior abuse by another individual, and (d) exclusion of evidence of alleged prior dishonesty by the victim. The underlying factual circumstances in items (a), (b), and (c) correspond to federal Grounds 2, 3 and 5, respectively. However, in arguing Ground 8(b) as to items (b) and (d) petitioner argues exclusively that the state supreme court erred *as a matter of state law*.

Petitioner posits:

> . . . . The relevant question [based upon petitioner's reading of *Sipsas*] is whether, in this case, the outcome of the direct appeal would have been different had appellate counsel raised an issue of cumulative error. Answering this question necessarily *requires this Court to determine whether the direct appeal claims had merit*, and if so, to what extent the cumulative effect of these errors prejudiced Koerschner.
>
> . . . . [B]ecause the Nevada Supreme Court could have granted relief on a violation of either state or federal law, *it does not matter whether the direct appeal claims were based on federal law*.

#87, at 16-17 (emphasis added).

Petitioner thus posits that the assertion on federal habeas review of a claim of ineffective assistance of counsel for failure to raise a claim of cumulative error on direct appeal thereupon allows a federal court to conduct a *de novo* review of not only federal law issues *but also of the state law issues decided against the petitioner by the state's supreme court*. Such a suggestion simply is risible. The Supreme Court of Nevada is the final arbiter of Nevada state law. The state supreme court rejected Koerschner's claims of state law error on the direct appeal, and that is the end of that matter. A claim that appellate counsel was ineffective for failing to raise a cumulative error claim does not make a

/ / / /

-41-

federal district court a super supreme court reviewing a state supreme court's state law holdings.[70]

As discussed previously, the state supreme court's rejection of petitioner's claims – both state and federal – on the direct appeal wholly undercuts petitioner's ineffective-assistance claim in Ground 8(b). If the Supreme Court of Nevada found no error on any of the individual claims, there was not merely no reasonable probability – there was absolutely no probability – that the court would grant relief on a cumulative error claim premised on the same individual claims. That guts the ineffective-assistance claim of any possible viability. A claim of cumulative error cannot save – whether then or now on federal habeas review – a direct appeal where the appellate court rejected every individual claim as presenting no error. Appellate counsel's assertion of such a claim on Koerschner's direct appeal would have had no impact.

Ground 8(b) is wholly without merit and provides no basis for petitioner to relitigate *de novo* a state criminal direct appeal decided nearly 14 years ago.

Ground 8(b) does not provide a basis for federal habeas relief.[71]

---

[70]A different issue perhaps might have been presented if the state supreme court had found the presence of state law error but found the state law error to be harmless on the individual claims. A federal court in that situation then might have occasion to consider whether there was a reasonable probability of a different outcome on the appeal if direct appeal counsel had raised a claim of cumulative error – based on the state supreme court's antecedent finding of state law error on individual claims. That is not the situation here. The Supreme Court of Nevada found no error on direct appeal, under either state or federal law. The state supreme court's holding that there was no state law error is not subject to a second *de novo* consideration on federal habeas review.

[71]The Court, again, need not and is not going to readjudicate petitioner's direct appeal *de novo* – as to either state or federal claims on the appeal – to determine whether the state supreme court's rejection of Ground 8(b) withstands AEDPA review. The Court notes in passing with regard to the federal claims argued in the reply as to Ground 8(b), however, that: (a) this Court has held that the rejection of the federal claims in Ground 2 concerning the statements to Nurse Reynolds withstands review under AEDPA, and the Court further has rejected the federal claims as to the statements to Dr. Roberts on *de novo* review; and (b) the state supreme court's rejection of the federal claim argued as to the alleged prior abuse of the victim would appear to be neither contrary to nor an unreasonable application of clearly established federal law. *See Koerschner*, 116 Nev. at 1120, 13 P.3d at 457 (referring to the dissimilarity between a prior alleged incident involving rubbing of the victim's posterior and the incident in Koerschner's case involving vaginal penetration, as the prior alleged incident was not of a nature as to cause injuries such as were sustained by the victim in this case). There was little or no possibility that a claim of cumulative error based upon either alleged federal error would have changed the outcome on direct appeal. Under established law, effective appellate advocacy requires weeding out issues with little or no possibility of success.

The Court rejects petitioner's argument that *Delgado* and *Lewis* requires *de novo* review of Ground 8(b) for substantially the same reasons discussed in note 13. Neither case establishes that a state supreme court must provide

(continued...)

-42-

*Consideration of Possible Issuance of a Certificate of Appealability*

Under Rule 11 of the Rules Governing Section 2254 Cases, the Court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to Petitioner.

As to the claims rejected by on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484.

Grounds 1, 2, 6, 7 and 8 remained before the Court. Reasonable jurists would not find the district court's rejection of these grounds to be debatable or wrong.

In Ground 1, petitioner alleged the denial of a number of constitutional rights due to alleged deficiencies in his initial detention and charging. To the extent that petitioner relied upon the Fourth Amendment, the claims were barred by *Stone v. Powell, supra*. The Supreme Court in any event has rejected the proposition that errors of the type alleged preclude a conviction rather than provide a basis for immediate release from an allegedly improper initial detention. Petitioner did not cite any apposite United States Supreme Court precedent that would carry his burden under AEDPA. Petitioner's underlying proper person suggestion that the alleged errors deprived the state courts of all jurisdiction to convict was frivolous. **See text, *supra*, at 3-6 & n.6.**

In Ground 2, as argued herein, petitioner maintained principally that statements by the child sexual assault victim to medical providers were admitted in violation of the Confrontation Clause. The Court reviewed the ground under deferential AEDPA review as to statements to Nurse Reynolds and on *de novo* review as to statements to Dr. Roberts. A holding that the admission of the statements to Nurse Reynolds did not violate the Confrontation Clause because they fell within the firmly rooted

---

[71](...continued)
extensively articulated reasons for a decision to be subject to deferential review. *Richter* instead establishes beyond doubt that deferential review is not contingent upon the degree to which the state court articulates its reasons for rejecting a claim.

medical treatment hearsay exception was neither contrary to nor an unreasonable application of the governing precedent at the time, *Ohio v. Roberts, supra*. The state supreme court's factual finding that the statements to Nurse Reynolds were pertinent to her care of the patient was, amply, supported by the relevant trial evidence, which the Court  summarized at length herein.  **See text, *supra*, at 14-24.** Petitioner's factual arguments to the contrary were based upon flawed constructs. Petitioner relied upon a detective's reference to "later in the evening" in questioning the nurse three weeks after the emergency room examination.  At trial, the nurse emphatically rejected defense counsel's suggested inferences based on the statement, and the short time line instead reflected by the trial evidence undercuts petitioner's factual argument in this regard.  Petitioner's further suggestion that a medical provider seeking a true medical history is not engaged in diagnosis or treatment fundamentally misapprehended the role of a medical provider.  That is, the fact that the provider is seeking "the truth" does not *ipso facto* take the provider out of a medical into a legal or other non-medical investigative role.  The same trial evidence fully supported the Court's holding on a *de novo* review that the admission of the statements to Dr. Roberts did not violate the Confrontation Clause or otherwise violate the Constitution. **See text, *supra*, at 7-27.**

In Ground 6, petitioner alleged that he was denied due process of law by the admission of portions of a report by a physician who had passed away prior to trial.  Petitioner impermissibly sought to expand this claim in the federal reply to encompass a Confrontation Clause claim based upon references to the report in the testimony of a consulting expert medical witness.  Even if the Court were to consider the expanded factual basis for the claim, petitioner cannot establish that the state supreme court's rejection of a due process claim based on the admission of testimony by an expert medical witness regarding an examining physician's diagnosis considered in forming his opinion was either contrary to or an unreasonable application of Supreme Court precedent.  Even if the Court further were to consider the late-breaking reliance on the Confrontation Clause, the state supreme court's rejection of such a claim hardly could be contrary to or an unreasonable application of Supreme Court precedent given the existence of federal appellate authority recognizing that expert testimony of this nature fell within a firmly rooted hearsay exception.  **See text, *supra*, at 27-33.**

/ / / /

1        In Ground 7(a), petitioner alleged that he was denied effective assistance of trial counsel when counsel did not pursue the claims in Ground 1. The state supreme court's rejection of such a claim was neither contrary to nor an unreasonable application of *Strickland*, given the lack of merit of the underlying substantive claims as a basis for overturning a conviction. **See text,** ***supra,*** **at 33-34.**

        In Ground 7(b), petitioner alleged that he was denied effective assistance of trial counsel when counsel did not object to the State's – suitably veiled – use of a prior presentence report to impeach petitioner's testimony at trial regarding his employment history. Petitioner provided no cogent argument or apposite citation actually supporting his conclusory allegation that the impeachment was improper. Koerschner took the stand and testified as to his employment history, apparently seeking, *inter alia*, to establish that he was not home during the time period where the medical evidence reflected sustained sexual abuse of the child victim. If a criminal defendant takes the stand, the defendant obviously is subject to impeachment by the State with regard to his prior inconsistent statements. The state supreme court's rejection of this baseless ineffective-assistance claim was neither contrary to nor an unreasonable application of *Strickland*. **See text,** ***supra,*** **at 34-37.**

        In Ground 8(a), petitioner alleged that he was denied effective assistance of appellate counsel when counsel did not "federalize" unspecified claims on direct appeal. The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland*. It further appears that petitioner essentially abandoned the claim in the federal reply. **See text,** ***supra,*** **at 37-39.**

        In Ground 8(b), petitioner alleged that he was denied effective assistance of appellate counsel when counsel did not raise a claim of cumulative error. The state supreme court rejected every claim presented on direct appeal. Appellate counsel thus would not have prevailed on appeal by raising a claim of cumulative error on an appeal where the appellate court found no error. Petitioner's strained argument that the cumulative error claim requires this Court to conduct a *de novo* review of all of the direct appeal claims – under *state* law as well as federal law – is completely without merit. **See text,** ***supra,*** **at 39-42.**

        IT THEREFORE IS ORDERED that all remaining grounds in the petition, as amended, are DENIED on the merits and that this action shall be DISMISSED with prejudice.

        / / / /

1         IT FURTHER IS ORDERED that a certificate of appealability is DENIED.  **See text,** *supra***, at**

2    **43-46.**

3         IT FURTHER IS ORDERED that counsel shall comply with Special Order 108 in all

4    proceedings in this Court, meaning that counsel shall not refer again to the victim by her name rather

5    than by initials.[72]

6         The Clerk of Court shall enter final judgment accordingly in favor of respondents and against

7    petitioner, dismissing this action with prejudice.[73]

8         DATED this 9th day of September, 2014.

9

10

11                   LARRY R. HICKS
                           UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

---

22    [72]Special Order 108 states in pertinent part that "[i]f the involvement of a minor child must be mentioned, only the initials of that child should be used."  The Court understands that the minor child  in this case would not remain a child in the intervening years.  However, the privacy interests of a then-vulnerable child do not stop as to incidents in which they were involved as a child merely because they since have become an adult.  Nor does the potential for harm from disclosure end after the child becomes an adult.  Indeed, it is not difficult to conceive of scenarios in which such public disclosure during the former child's adult years may be quite harmful.  For all papers filed hereafter, the parties shall comply with Special Order 108 as to all individuals who were minors at the operative time, using only their initials. See also #60, at 5 (prior order in this case directing compliance with Special Order 108).

26

27    [73]Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record presented to the state court that adjudicated the merits of the claims. *See Pinholster,* 131 S.Ct. at 1398-1401.  Petitioner otherwise has not presented a viable basis for an evidentiary hearing in this matter as to claims considered on *de novo* review herein.